IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| FREEHOLD LICENSING, INC., at al. | § | |
| | § | |
| v. | § | A-18-CV-413 LY |
| | § | |
| AEQUITATEM CAPITAL PARTNERS, | § | |
| LLC, et al. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and

Improper Venue (Dkt. No.  8) and Defendants' Opposed Motion to Transfer (Dkt. No. 12), along

with the associated responses and replies (Dkt. Nos. 9, 11, 14, 15).  The undersigned submits this

Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B), Federal

Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules.

## I.  GENERAL BACKGROUND

### A.     The Parties

Freehold Capital Partners LLC ("FCP"), is a Nevada limited liability real estate holdings

company which at various times has been licensed to do business in Georgia, New York, and Texas.

*See* Dkt. Nos. 8-4 to 8-6; 8-39.  During the events that led to this lawsuit, FCP had its principal place

of business in Atlanta, Georgia ( Dkt. No. 8-5), and was not registered to do business in Texas.  It

withdrew is registration in Georgia in April 2017 (Dkt. No. 8-6), but did not register with the State

of Texas to do business until a year later in March 2018, two months before this suit was filed.  Dkt.

No. 8-4.  Importantly, in that filing, FCP stated that the first date on which it conducted any business

in Texas was on December 20, 2017, after most of the events at issue in this case took place.  Indeed,

the records filed with these motions show that FCP's home address has been something of a moving

target, as in various emails between 2016 and 2017 and in a marketing brochure , FCP identified its

address as being in either Atlanta or New York City, though never in Texas  *See* Dkt. Nos. 8-10

(Atlanta), 8-11 (same), 8-16 at 14 (NYC is FCP's "Home Office"); 8-23 (Atlanta); 11-2 to 11-5

(Atlanta); 11-6 to 11-7 (NYC).  The Court was unable to locate any emails in which FCP represented

to the Defendants that its address was in Texas.

Freehold Licensing, Inc. ("FLI") is a Nevada corporation wholly owned by Joe Alderman.

Dkt. No. 6 at 2 ¶ 5.  (Though Alderman is a resident of Round Rock, he is not a party to this case.)

FLI owns 84.662% of FCP.  *Id.*  FLI alleges in the First Amended Complaint that its principal place

of business is in Texas, but it has not submitted any records from the Texas Secretary of State

indicating it is registered to do business in Texas, and its filings with the Nevada Secretary of State

list its registered agent as being located in Nevada.  *See* Dkt. No. 8-3.[1]

---

[1]In a lengthy affidavit attached to Plaintiffs' response to the motion, Alderman spends many pages describing the connections between FCP, FLI, and Round Rock, and claims that the "nerve center" of both companies has been located in his home office since 2014. Dkt. No. 9-1. He points out that since at least 2014, the companies' operating bank accounts have been in Texas, most of their books and records have been maintained there, and they have listed Round Rock as their mailing address on their federal tax filings.  He also notes that in 2014 and 2016, FCP made franchise tax filings (with "no tax due") with the Texas Secretary of State, and in those filings it listed its address as being in Round Rock, Texas.  *Id.* at ¶¶ 13-22.  While the Court does not doubt any of this information, and none of it is disputed, it does not contradict the fact that the registered place of business for FCP in 2016 and 2017 was in Georgia, it listed its address in the very contracts at issue in this suit as being in Georgia, and in all of the communications before the Court sent by FCP to the Defendants  FCP listed its address as either being in Georgia or New York City.  Further, in all of his correspondence, Alderman identifies himself as being a "J.D."  Given the sophisticated nature of the transactions at issue, and the fact that Alderman is apparently an attorney, it is fair for the Court to assume that FCP and FLI were aware of the legal impact of their decisions regarding where they registered to do business, and where they held out their locations to be.

Aequitatem Capital Partners, LLC ("ACP") is a Delaware limited liability company, with a its principal place of business in New York.  ACP was formed specifically to make investments in FCP and to advise FCP on its business and capitalization.  Mark Morel is one of the principals of ACP and was ACP's primary contact with Plaintiffs during the relevant time period underlying this dispute.  Morel is a resident of the State of Georgia and has lived there since 1986.  Jeffrey Siegel is one of the principals of ACP and is a resident of the State of New York and has lived there since 1988.  Catherine "Katy" Rice is also a principal of ACP and is a resident of the State of New York.  Rice states that she has lived and worked in the New York/New Jersey areas since 2003.

**B.      The Facts**

In February 2016, before ACP was formed, Morel (who was living and working in Atlanta), contacted FCP President Carter Burton (who was working out of FCP's Atlanta office) to express ACP's interest in assisting Freehold grow its business and potentially seek investment partners. Morel informed Burton that he had a lot of experience in raising capital, including relationships with numerous venture and investment banks.  Over the course of the next few months, Morel met Burton, Alderman and FCP's Chief Operating Office several more times in Atlanta to discuss the possible business venture.  In March 2016, Morel, Siegel and Rice all signed non-disclosure agreements with FCP which contained a choice of law provision specifiying that the rights and liabilities of the parties to the NDA would be determined in accordance with the laws of the State of Georgia.  In April 2016,  Morel, Siegel and Rice all joined FCP's principals in Atlanta to discuss a potential business arrangement.  Plaintiffs allege that during this and subsequent meetings, the Defendants emphasized they were experts in securities transactions and led Plaintiffs to believe that they held securities licenses.

On June 8, 2016, Plaintiffs and Defendants entered into an agreement (the "Commitment Agreement") setting out the terms and conditions for ACP to "provide debt and equity capital of up to Two Hundred Million ($200,000,000.00)" to FCP. Dkt. No. 8-19 at 1. The Commitment Agreement listed ACP as a Delaware limited liability company located in "Atlanta, GA" and listed FCP as a Nevada limited liability company "having its principal place of business at 903 Peachtree, Street, NE, Atlanta, GA 30308." *Id.* The Commitment Agreement also provided that it would be "governed by the laws of the State of Georgia without giving effect to the principles of conflicts of law." *Id.* at 13. Plaintiffs contend that Defendants falsely claimed in the Commitment Agreement that "ACP's management team has significant experience in raising capital in amounts, and under terms, such as those contemplated herein. . . ." Dkt. No. 8-19 at 2.

A few months later, on August 22-23, 2016, Morel flew to Austin, Texas to meet with Alderman to discuss the parties' continuing business relationship and to develop a business plan for FCP to present to potential investors. Morel met with Alderman at his home, where Alderman conducted FCP's business. On August 31, 2016, after Morel returned to Atlanta, the parties had a conference call with an Atlanta-based law firm to discuss legal documentation for preparing term sheets and fund documents. All of the Defendants participated from their respective states outside of Texas. Alderman participated in the conference call from his home in Austin.

On December 10, 2016, the parties amended their agreement and entered into a new Commitment Agreement, as well as a Commission Agreement in which the Plaintiffs agreed to retain ACP as its "exclusive advisor" for and on behalf of FCP in connection with FCP's issuance of convertible notes and otherwise in connection with providing the services as defined in the

Agreement.[2]  Dkt. No. 6-1 at 1.  ACP agreed to use "commercially reasonable efforts" to coordinate the introduction of FCP to individuals, firms or other entities that may have an interest in entering into the convertible notes. *Id.* In return, ACP would receive transaction-based compensation in the form of "a fee of five percent (5%) of the Actual Amount Raised, payable in cash pro-rata at each closing and funding of the Convertible Notes." *Id.* at 1-2.  ACP also would receive warrants to purchase up to three percent (3%) of Freehold's equity, with the three percent tied to the amount raised. *Id.*

Plaintiffs contend that the agreements show that ACP contracted to act as FCP's "Exclusive Advisor" in connection with FCP's sale of securities for compensation and that ACP was subject to registration under the Investment Advisers Act of 1940 and the Securities Exchange Act.  Plaintiffs further contend that Defendants met with numerous prospective investors and advised FCP regarding valuations that would be appropriate for the convertible notes and warrants, all of which are investment advisory services requiring licensure.  FCP contends that it would not have entered into the agreements had Morel, Siegel, Rice and ACP disclosed that they could not lawfully perform the services called for by the agreements.  Dkt. No. 6 at 10.  Defendants contend that nothing in the revised agreement or the negotiations leading up to it asserted that ACP was a broker dealer.

In April 2017, ACP introduced FCP to non-party Richmond Hill Investment Company ("RHIC"), a privately owned New York investment management company which expressed interest

---

[2]The amended Commitment Agreement provides that it "shall be governed by the laws of the State of Georgia without giving effect to the principles of conflicts of law." Dkt. No. 6-1 at 31.  In contrast, the "Commission Agreement" states that it is "governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within the State of New York, without regard to the conflicts of law principles of the State of New York." *Id.* at 3.

in investing in FCP.  After the parties met in New York, ACP, FCP, and RHIC signed a term sheet

on June 29, 2017, and RHIC agreed to issue FCP approximately $30,000,000 in senior convertible

notes.  On December 10, 2017, FCP and RHIC executed a "Convertible Note Purchase Agreement"

("RHIC Agreement") and scheduled the closing for December 15, 2017.  The closing date was

extended to January 26, 2018, because Plaintiffs and RHIC continued to negotiate the terms of their

agreement.

In late December, Plaintiffs contend that they discovered for the first time that Defendants

were not registered with the SEC to provide advisory and brokerage services.  A dispute then arose

between Plaintiffs and Defendants with regard to whether or not Defendants needed to be registered

with the SEC in order to receive their fee for helping facilitate the FCP/FHIC agreement.  FCP

argued that Defendants' registration was necessary in order to be paid their fee, or at the very least,

requested a formal, opinion letter from a qualified securities lawyer stating that registration was not

necessary.  FCP informed ACP that it would hold its fee in trust until they received such a clearance

letter.  The day before the closing of the RHIC Agreement, RHIC informed FCP that it was going

to walk away from the deal.  Plaintiffs contend that ACP convinced RHIC not to close unless FCP

paid ACP its fee.  Thus, Plaintiffs allege that ACP tortiously interfered with its contract with RHIC.

In May 2018, Plaintiffs filed this lawsuit.  They allege that  Morel, Siegel and Rice

misrepresented themselves as registered securities professionals and fraudulently agreed (in the

Commission Agreement) to provide advisory and broker services without being registered with the

SEC, in violation of state and federal securities laws.  Plaintiffs further allege that Defendants

intentionally and maliciously interfered with and destroyed a multi-million dollar transaction,

causing Freehold to suffer damages well in excess of $75,000.00. Plaintiffs allege claims for tortious

interference, fraud, civil conspiracy, negligence, negligent misrepresentation, legal malpractice (as

to Siegel), and breach of fiduciary duty, as well as a claim under the Securities Exchange Act.

In response, Defendants move under Rule 12(b)(2) for dismissal of the suit against each of

them for lack of personal jurisdiction and improper venue.  In a separate motion, Defendants assert

the case should be transferred to the Northern District of Georgia pursuant to 28 U.S.C. § 1404(a).

## II.  MOTION TO DISMISS FOR LACK OF JURISDICTION

Defendants argue that the only connection this case has to Texas is that non-party Joe

Alderman, owner of FLI, lives in Round Rock, Texas and that Defendant Morel flew to Texas two

times to meet with Alderman.  Defendants emphasize that none of them are Texas residents.  In

addition, Defendants argue that FCP was not a Texas resident at the time the parties negotiated and

entered into the relevant agreements in this case, and it only registered to do business in Texas *after*

their relationship fell apart, and two months before filing this lawsuit.  Defendants also note that all

of the choice of law provisions contained in the agreements provide for either Georgia or New York

(not Texas) law to apply.  Defendants argue that the Court does not have personal jurisdiction over

them and the lawsuit must therefore be dismissed.

Plaintiffs respond that the Court has specific personal jurisdiction over Defendants because

they:

> aimed communications towards Texas that contained material misstatements and
> omissions which form the basis of Plaintiffs' tort claims, and such communications
> were in furtherance of Defendants' unlawful scheme to obtain transaction-based
> compensation in violation of Federal statutes, all of which had reasonably foreseeable
> effects in Texas.

Dkt. No. 9 at 2.  Plaintiffs further contend that the Court has specific personal jurisdiction over

Defendants with regard to their claims under the Securities Exchange Act and the Federal

Declaratory Judgment Act, based on 15 U.S.C. § 78aa and that the Court has pendent jurisdiction

over the remaining claims.

**A.       Personal Jurisdiction Principles**

A non-resident defendant may move to dismiss for lack of personal jurisdiction under Rule

12(b)(2). "If, as here, the court rules on personal jurisdiction without conducting an evidentiary

hearing, the plaintiff bears the burden of establishing only a *prima facie* case of personal

jurisdiction." *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 101 (5th Cir. 2018).

"The district court is not obligated to consult only the assertions in the plaintiff's complaint in

determining whether a *prima facie* case for jurisdiction has been made.  Rather, the district court may

consider the contents of the record at the time of the motion. . . ." *Id.* (internal quotations and

citations omitted).  "Although jurisdictional allegations must be accepted as true, such acceptance

does not automatically mean that a *prima facie* case for [personal] jurisdiction has been presented."

*Id.*  The plaintiff must prove that the court has jurisdiction over the defendant with regard to each

claim.  *Sieferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006).

With regard to the Court's jurisdiction over the subject matter of this case, Plaintiffs argue

that there is both diversity and federal question jurisdiction over the case.  Dkt. No. 6 at 4.  A federal

court *sitting in diversity* may exercise personal jurisdiction over a non-resident defendant if (1) the

state's long-arm statute permits an exercise of jurisdiction over that defendant, and (2) an exercise

of jurisdiction would comport with the requirements of the Due Process Clause of the Fourteenth

Amendment.  *Sangha,* 882 F.3d at 101; *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009), *cert.*

*denied,* 131 S.Ct. 68 (2010).  Because the requirements of Texas's long-arm statute are coextensive

with the requirements of the Due Process Clause, the sole inquiry is whether this Court's exercise

of personal jurisdiction over the Defendants would be consistent with due process. *Id.*   The

Supreme Court has articulated a two-part test to determine whether a federal court sitting in diversity

may properly exercise personal jurisdiction over a nonresident defendant: (1) the nonresident must

have sufficient "minimum contacts" with the forum state, and (2) subjecting the nonresident to

jurisdiction in the forum state must not offend traditional notions of "fair play and substantial

justice."  *McFadin*, 587 F.3d at 759 (citing *Int'l Shoe*, 326 U.S. at 316).  A defendant's "minimum

contacts" may give rise to either *specific* or *general* personal jurisdiction, depending on the nature

of the suit and defendant's relationship to the forum state.  *Jackson v. Tanfoglio Giuseppe, S.R.L.,*

615 F.3d 579, 584 (5th Cir. 2010).

In contrast, "the requirement that the defendant have minimum contacts with a forum state

does not apply in a federal question case in which personal jurisdiction is attained pursuant to a

federal statute authorizing nationwide service of process." *Allen v. Byrne*, 2008 WL 1869237, at *2

(N.D. Tex. Apr. 28, 2008) (citing *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255,

1258 (5th Cir. 1994)).  "[W]hen a federal court is attempting to exercise personal jurisdiction over

a defendant in a suit based upon a federal statute providing for nationwide service of process, the

relevant inquiry is whether the defendant has had minimum contacts with the United States." *Busch*,

11 F.3d at 1258.  If the defendant has sufficient minimum contacts with the United States, the Court

has personal jurisdiction over the defendant.  *Id.*

**B.      Does this Court have personal jurisdiction over Defendants?**

In addition to their common law and Texas statutory claims, Plaintiffs also bring claims

under Sections 10(b) and 15 of the Exchange Act, which provides for nationwide service of process.

15 U.S.C. § 78aa ("process in such cases may be served in any other district of which the defendant

is an inhabitant or wherever the defendant may be found").[3]  See also, *Luallen v. Higgs*, 277 F.

App'x 402, 404 (5th Cir. 2008) (noting that the Exchange Act provides for nationwide service of

process).  As noted, "when a federal court is attempting to exercise personal jurisdiction over a

defendant in a suit based upon a federal statute providing for nationwide service of process, the

relevant inquiry is whether the defendant has had minimum contacts with the *United States*." *Busch*,

11 F.3d at 1258 (emphasis added).[4]  Thus, in analyzing whether personal jurisdiction is proper under

§ 78aa of the Exchange Act, the Court must determine whether the defendants had sufficient

minimum contacts with the United States.  *Id.* at 1257-58.  There is little question about that, as each

defendant resides and works in the United States.  This is sufficient to establish personal jurisdiction

over the defendants with respect to the Exchange Act claim.  *See Busch*, 11 F.3d at 1258 ("Given

that the relevant sovereign is the United States, it does not offend traditional notions of fair play and

substantial justice to exercise personal jurisdiction over a defendant residing within the United

States."); *see also*, *CEH Energy, LLC v. Kean Miller, LLP,* 691 F. App'x 215, 216 (5th Cir. 2017)

(noting that the relevant inquiry in an Exchange Act case is "whether the defendant had minimum

contacts with the United States.").  The Court therefore has personal jurisdiction over the Defendants

with regard to the Exchange Act claim.

---

[3]Though Plaintiffs purport to bring a § 15 claim, the Fifth Circuit has not decided whether a private cause of action exists under that section.  *See Knutson v. Harris*, 2018 WL 4281557 at *7 (N.D. Tex. Sept. 6, 2018) (noting that the Fifth Circuit has not addressed the question).

[4]In *Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 825-26 (5th Cir. 1996), the Fifth Circuit criticized the *Busch* decision but nevertheless applied its holding to find that the court had personal jurisdiction over the defendant based on the nationwide service of process provision contained in § 1132(e)(2) of ERISA.

Because the federal and state claims arise out of a "common nucleus of operative fact," they would be expected to be brought in a single lawsuit. The Court therefore may properly exercise pendent jurisdiction over the non-federal claims. *See United Workers v. Gibbs*, 383 U.S. 715, 725 (1966) (pendent jurisdiction may be exercised when federal and state claims have a "common nucleus of operative fact" and would "ordinarily be expected to [be tried] all in one judicial proceeding"). Accordingly, under the doctrine of "pendant personal jurisdiction," it would appear that the Court has personal jurisdiction over the Defendants as to all of the claims in this case. *See Allen*, 2008 WL 1869237 at * 3. Thus, Defendants' Motion to Dismiss based on a lack of personal jurisdiction should be denied.

### III.   MOTION TO TRANSFER VENUE

In addition to the argument that the Court lacks personal jurisdiction over them, Defendants alternatively move pursuant to 28 U.S.C. § 1404(a) to transfer the case to the Northern District of Georgia (or the Southern District of New York). Defendants argue that the claims all center around the parties' initial discussions that took place in Georgia, and that the alleged contract interference was perpetrated by residents of Georgia and New York, and involved a contract slated to be executed in, and governed by the laws of, New York. Defendants emphasize that the only connection this case has to Texas is that Alderman—who is not a party—resides in Round Rock, and Morel met with him there twice. Defendants note further that FCP's principal place of business during the negotiations and execution of the agreements was in Atlanta, not Round Rock. FCP did not register with the Texas Secretary of State until all of the relevant events had passed, and only two months before filing suit. Finally, they emphasize that the majority of the fact witnesses and documents are in Georgia, not Texas.

A.      **Standard of Review**

"For the convenience of the parties and witnesses, in the interest of justice, a district court

may transfer any civil action to any other district or division where it might have been brought." 28

U.S.C. § 1404(a).  Section 1404(a) "is intended to place discretion in the district court to adjudicate

motions for transfer according to an 'individualized, case-by-case consideration of convenience and

fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*,

376 U.S. 612, 622 (1964)).   "There can be no question but that the district courts have broad

discretion in deciding whether to order a transfer" under § 1404(a).  *In re Volkswagen of Am., Inc.*

(*"Volkswagen II"*), 545 F.3d 304, 313–15 (5th Cir. 2008) (internal quotation marks omitted), *cert.*

*denied*, 555 U.S. 1172 (2009).

The starting point on a motion for transfer of venue is determining whether the suit could

have originally been filed in the destination venue.  *Id.* at 312.  If it could have, the focus shifts to

whether the party requesting the transfer has demonstrated the "convenience of parties and

witnesses" requires transfer of the action, considering various private and public interests.  *See Gulf*

*Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1974).  The private interest factors are: "(1) the relative ease

of access to sources of proof; (2) the availability of compulsory process to secure the attendance of

witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that

make trial of a case easy, expeditious and inexpensive." *In re Volkswagen AG ("Volkswagen I")*,

371 F.3d 201, 203 (5th Cir. 2004) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6

(1981)).  The public interest factors are: "(1) the administrative difficulties flowing from court

congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of

the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of

conflict of laws [or in] the application of foreign law." *Id.* Although the *Gilbert* factors are "appropriate for most transfer cases, they are not necessarily exhaustive or exclusive." In fact, the Fifth Circuit has noted "none . . . can be said to be of dispositive weight." *Volkswagen II*, 545 F.3d at 313–15 (internal quotations omitted). Notwithstanding all of these factors, a court must engage in a "flexible and individualized analysis" in ruling on a motion to transfer venue. *Stewart*, 487 U.S. at 29. Transfer under § 1404(a) does not require a showing that the *Gilbert* factors substantially outweigh the plaintiff's choice of venue—it is enough to show the new venue is clearly more convenient than the original one.

Lastly, it is important to note that a plaintiff's choice of venue is not a factor in this analysis, but instead is accounted for by the defendant having the burden to show good cause for the transfer. *Volkswagen II*, 545 F.3d at 313 & 314 n.10 "[W]hile a plaintiff has the privilege of filing his claims in any judicial division appropriate under the general venue statute, § 1404(a) tempers the effects of the exercise of this privilege." *Id.* "[W]hen a plaintiff is not a resident of the chosen forum, or the operative facts underlying the case did not occur in the chosen forum, the court will not give as much deference to a plaintiff's choice." *Apparel Prod. Servs. Inc. v. Transportes De Carga Fema, S.A.*, 546 F. Supp.2d 451, 453 (S.D. Tex. 2008).

B.      **Application of § 1404(a) Factors**

The Court must first address whether the case could have originally been filed in the Northern District of Georgia. Under the federal venue statute, a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). Because a substantial part of the events or omissions giving rise to this lawsuit occurred in the Northern District of Georgia, this lawsuit could have been filed there. Plaintiffs do not dispute this. The analysis therefore moves to the public and private interest factors.

**1.      Private Interest Factors**

a.      Relative ease of access to sources of proof

Alderman states in his affidavit that all of FCP and FLI's documents relevant to this case (which he describes as "multiple thousands") are presently located in Round Rock, Texas. Other relevant documents are in the possession of the firms' attorneys, who are located in Atlanta, Georgia. With regard to the Defendants, the vast majority of relevant documents that ACP possesses (roughly 16,000 documents) are located in Atlanta. Some documents are also located in New York. The Agreement underlying this lawsuit was negotiated and executed in Atlanta and at that time, both ACP and FCP were located in Atlanta. Though there are persuasive facts on both sides of this issue, this factor slightly favors transfer, because though FCP's documents are now in Round Rock, when the events at issue took place, FCP's principal place of business was in Atlanta.

b.      Convenience of the Witnesses

While the convenience of the witnesses "is often regarded as the most important factor to be considered in deciding whether to transfer venue," it is the convenience of *non-party witnesses* which is accorded the most weight. *Woolf v. Mary Kay Inc.*, 176 F. Supp.2d 642, 650 (N.D. Tex. 2001); *Ternium Intern. U.S.A. Corp. v. Consol. Sys.*, 2009 WL 464953, at *4 (N.D. Tex. Feb. 24, 2009). Plaintiffs have identified several witnesses, including Alderman, who reside in Texas.

However, it is unclear whether Plaintiffs are arguing that retaining the case here would be more convenient for non-party witnesses or Plaintiffs' employee-witnesses. If the Plaintiffs are referring to employee witnesses, then their convenience would be entitled to little weight. *See e.g., Gardipee*, 49 F. Supp.2d at 930 ("Where, as here, the key witnesses of the party seeking transfer are employees of that party, their convenience is entitled to less weight because that party will be able to compel their testimony at trial."); *In re Triton Ltd. Sec. Litig.*, 70 F. Supp.2d 678, 690 (E.D. Tex. 1999) ("It is the convenience of non-party witnesses, rather than of employee witnesses, however, that is the more important factor and accorded greater weight").  In contrast, ten of the eleven witnesses identified by Defendants reside either in Georgia or New York.  Accordingly, this factor weighs in favor of transfer as well.

   c.     All other practical problems

Finally, the Court is to examine "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen I*, 371 F.3d at 203.  There does not appear to be anything about trying the case in the Western District of Texas that would make it easy, expeditious or inexpensive for the majority of the parties and witnesses in this case.  Plaintiffs main argument is that it would be more convenient for them to try the case here since their attorney and Alderman reside in Texas.  Alderman is the CEO of FCP, and as already noted, the convenience of party witnesses is not a factor entitled to much weight.  And "[t]he word 'counsel' does not appear anywhere in § 1404(a), and the convenience of counsel is not a factor to be assessed in determining whether to transfer a case under § 1404(a)." *Id*. at 206.  *See also, In re Horseshoe Entm't*, 337 F.3d 429, 434 (5th Cir. 2003) (finding that the "factor of 'location of counsel' is irrelevant and improper

for consideration in determining the question of transfer of venue.").[5]  Thus, this factor also favors

transfer to the Northern District of Georgia.

## 2.    Public Interest Factors

The public interest factors include the administrative difficulties flowing from court

congestion, the local interest in having localized interests decided at home, the familiarity of the

forum with the law that will govern the case, and avoidance of unnecessary problems of conflict of

laws.  As explained above, two of the three contracts which form the basis for this lawsuit contain

Georgia choice of law provisions, and a third includes a New York choice of law provision.  In

addition, each of the defendants signed a non-disclosure agreement with Plaintiffs which also

contained Georgia choice of law provisions. None of the agreements involved provide for the

application of Texas law.  Because Georgia law governs the majority of the contract issues, judicial

economy would be served by having a Georgia court preside over this case.  *See Harland Clarke*

*Holdings Corp. v. Milken*, 997 F. Supp. 2d 561, 589 (W.D. Tex. 2014) (finding that transfer was

appropriate to Delaware where Delaware law was at issue in the case).

Finally, the Western District of Texas does not have a strong interest in this case because

none of the events giving rise to this lawsuit occurred here.  *See Volkswagen I*, 371 F.3d at 206

(finding that "the 'local interest in having localized interests decided at home,' weighs heavily in the

favor of the Western District of Texas.").  The only connection this case has to the Western District

of Texas is the fact that FLI's owner and FCP's CEO, Joe Alderman lives here.  As noted, he is not

a party to this lawsuit.  In addition, at the time the parties negotiated the agreements at issue in this

---

[5]Moreover, because Plaintiffs' attorneys are located in Arlington, not Austin, they would
have to board a plane even to get to Austin, and Atlanta is not appreciably further from Austin than
Arlington is (2:05 flight time vs. 0:55 flight time).

lawsuit, FCP had its principal place of business in Georgia, and Alderman changed that only two months before filing this lawsuit.  Based on the foregoing, the Court finds that the public factors also favor transfer.

Weighing all of the private and public factors, the Northern District of Georgia is clearly a more convenient venue for this case than this court, and this case should be transferred to the Northern District of Georgia, pursuant to 28 U.S.C. § 1404(a).

## IV.  RECOMMENDATION

The undersigned **RECOMMENDS** that the District Court **DENY**  Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue (Dkt. No.8), **GRANT** Defendants' Opposed Motion to Transfer (Dkt. No. 12) and **TRANSFER** this case to the Northern District of Georgia , pursuant to 28 U.S.C. § 1404(a).

## V.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections. *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-153, 106 S.Ct. 466,

472-74 (1985);  *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

SIGNED this 29th day of October, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE